**J. W. MULLINS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 38550.**

Court of Criminal Appeals of Texas.

Nov. 24, 1965.

Rehearing Denied Jan. 19, 1966.

Dennis P. Ratliff, Haskell, Scarborough, Black, Tarpley & Scarborough, by Davis L. Scarborough, Abilene, for appellant.

Roy Adkins, Dist. Atty., Haskell, and Leon B. Douglas, State's Atty., Austin, for the State.

BELCHER, Commissioner.

The conviction is for murder; the punishment, fifteen years.

The testimony offered by the state reveals that after the appellant and Herman Lacey left a drive-in about 11:30 A.M. in appellant's pickup, the appellant said, "Would you like to play a little?," and Lacey answered, "Yeah, I guess so," and the appellant replied, "Well, maybe we can find something," and drove about three or four blocks and turned in the driveway at Hazel Newton's house. Appellant stayed in the pickup while Lacey knocked on the front door. When no one answered he went to the rear door. When Hazel Newton answered he asked if she wanted to play a little and she slammed the door closed. Lacey returned to the pickup and said, "Let's go," and appellant replied, "No." As the appellant started toward the front door, the deceased, who lived next door, came out of his house and told appellant that Hazel Newton was not at home. When appellant returned to the pickup Lacey said, "Well, I know she is, I just talked to her at the back door." According to Lacey the appellant then asked the deceased why he lied to him, telling deceased that Lacey had just talked with Hazel Newton at the rear door. The deceased called appellant a "damned liar," and the appellant said, "I will just whip you," and he got out of his pickup and went over to the deceased. After a brief time the appellant lunged at the deceased, and the deceased hit him in the head with a brick.

Hazel Newton testified that she had known the appellant eight or nine years and that he frequently came to her house; that after Lacey left she heard the deceased say she was not at home because she had told him the day before that she would not be there; that she heard the appellant say: "What do you know about it? You don't have a right to tell her what to do," and appellant jumped out of his pickup, and went across her yard to the deceased's house, and while deceased was on the walk and the appellant was on the north side of it the deceased said, "Johnny (appellant), put up your knife, put up your knife," and Lacey went after the appellant and they soon left the scene. She further testified that about one month before this difficulty, the appellant told her that he was going to do away with the deceased and showed her a chain which he said he had for his neck.

Danny Stewart, age 11, who lived across the street testified that while the deceased was on his porch, the appellant went toward the porch, and shoved the deceased down, they began fighting, and the deceased bent over and appellant went back to the pickup.

It was stipulated that the deceased was cut by the appellant on the occasion in question with a knife.

Dr. Brooks, a physician, who performed the autopsy on the body of the deceased, testified that he suffered a cut wound five inches long in the lower part of the abdomen, and that in his opinion pulmonary infarct was the cause of death.

While testifying, the appellant admitted cutting the deceased one time with a knife but said he did it in self-defense. The appellant testified that after having several drinks of whiskey with his friends between 9 and 11:30 A.M., he was driving his pickup along a street accompanied by Herman Lacey, when Lacey asked him to drive in the driveway at Hazel Newton's house and wait until he could see her. After stopping as asked, Lacey got no response at the front door. While Lacey went to the rear door, the deceased who lived next door, opened his front door and said, "She is not there, she left early this morning," and appellant nodded his head. When Lacey returned he said Hazel Newton was there, that he talked with her, and the appellant, while seated in the pickup, said to the deceased who was at the door of his house, "Why do you want to lie to me for?," and the deceased ran

from his house saying, "You ——————, I will kill you." The deceased then grabbed three bricks, and hit the appellant in the head with the first one, missed when he threw the second, and with the third brick in his hand he ran toward the appellant, who drew his pocket knife and cut the deceased to keep him away; and that the cutting part of the blade was two and one-half inches long. After the appellant cut the deceased, the deceased struck at him again and then walked toward a neighbor's house. The appellant testified that he never went over to deceased's place, and he was never near the sidewalk that ran from deceased's house to the street.

■ It is insisted that the state erred in introducing evidence of previous misconduct and of other offenses which the appellant was not charged with in this prosecution, and in doing so violated instructions of the court.

The formal bill reflects that the trial judge, prior to the reading of the indictment, announced in the presence of the attorneys for the state and the appellant that he would not permit any proof of prior sexual relations between the appellant and Hazel Newton. The bill further reflects that the state's witness Lacey testified on direct examination that after passing some women the appellant asked him if he "would like to play a little," and then Lacey was asked if appellant said in his presence "he knew where he could get some pretty good stuff," which was not answered due to the sustaining of appellant's objection that the witness Newton, when asked if appellant was a frequent visitor to her house, said he had been there three times a day "maybe two"; that Nellums, a neighbor, testified he had seen the appellant at Newton's house on more than one occasion; and another testified that appellant had been at Newton's "off and on all time." On cross-examination of appellant he was asked if he had not said where they could get

some good stuff and also that "Miss Newton wasn't any stranger to you?"

There is evidence in the record without objection of the circumstances surrounding the difficulty and the previous relationship of the parties. No proof was offered of any prior sex relations as the court had announced. In considering appellant's contention in the light of the same or substantially the same evidence admitted without objection, no reversible error is shown.

■ It is contended that the state, in offering the trousers of the deceased into evidence, created a prejudice against the appellant and inflamed the minds of the jury, and such evidence warrants a reversal of this case.

No witness for the state testified to actually seeing a knife. No knife was introduced in evidence. The state never had possession at any time of the weapon used. The only description of the knife was from the testimony of the appellant. According to the testimony the trousers show a four inch cut in front below the waist band, that the metal zipper was severed, but there is no testimony of blood on them or of any repulsive condition. No reversible error is presented. Garza v. State, 159 Tex.Cr.R. 105, 261 S.W.2d 575. It is observed that after the trousers were introduced it was stipulated that the deceased was cut by the appellant with a knife. The stipulation was made after ten state witnesses had testified including three who were at the scene of the difficulty at the time it occurred.

The appellant contends that the evidence is insufficient to show that the knife was a deadly weapon, and also is insufficient to show an intent to kill.

The knife used was never exhibited at the trial or introduced in evidence. The court instructed the jury that the knife in question was not a deadly weapon in itself; and that the law did not presume

that appellant intended to kill the deceased by the use of the knife in question.

■ The facts and circumstances as above related in the summary of the facts are sufficient to warrant and support the finding of the jury that the appellant intended to kill the deceased by cutting him with a knife.

It is insisted that the evidence is insufficient to "establish as a matter of law, beyond a reasonable doubt, that the death of C. F. White (deceased) was due to the cutting in his abdomen."

Immediately after the deceased was cut about 11:30 A.M., December 12, 1964, he approached a neighbor's house seeking aid while holding a portion of his intestines in his hands which were protruding from his abdomen, and he was taken to the hospital.

Dr. Cadenhead testified that the deceased suffered an incision about five or six inches long and two or two and one-half inches deep in the abdomen; that the cut was through the abdominal cavity, through a portion of the bowel, and also cut the blood veins in the mesentery, and they repaired the little artery and sutured up his mesentery; that he progressed very well for about ten days, when according to the nurse he was doing fine at 6 A.M. and on seeing him an hour later at 7 A.M. he was dead. To determine the actual cause of his death, Dr. Cadenhead requested an autopsy.

Dr. Brooks testified that he performed an autopsy on the body of the deceased and expressed the opinion that pulmonary infarct was the immediate cause of death; that his examination revealed a recently repaired five inch wound in the mid-line of the lower portion of the abdomen; that a cut in the mesentery and a break in the bowel had been repaired; that he found a blood clot at a place in the venous vessels from which in his opinion the pulmonary embolus had originated; and that it was established that the clot did not develop where it was found, and that in his opinion the clot developed in the mesenteric veins of the abdomen.

■ The evidence is sufficient to support the finding that the cause of the death of the deceased was from a cutting with a knife inflicted by the appellant.

The appellant contends here as he alleged in his motion that the jury was guilty of misconduct which entitles him to a reversal on the ground that the jury speculated on the time appellant would have to serve and then assessed the punishment which they thought would accomplish that result. The four jurors who were called to testify in support of the motion refused to sign affidavits.

After finding the appellant guilty of murder with malice, the jury sent the trial judge a note asking how much time one would have to serve on a certain sentence. The judge declined to answer the question.

Juror Barbee testified that after concluding that the appellant would not have to serve the full fifteen years, and notwithstanding whether he would have to serve four or five years, his verdict would have been the same.

Juror Cox testified that he did not know how much time the appellant would have to serve, but he was of the opinion that he would not have to serve the full fifteen years on which they agreed.

Juror Glover testified that he knew there was a parole law but did not know the length of time that would have to be served on any certain sentence.

Juror Alvis, the foreman, testified that they did not know how much credit a person would get on a sentence; and when he started trying to figure, Juror Barbee, who had been holding out, said no use to figure "We will make it unanimous."

■ The matters discussed by the jurors did not violate any statute and were not so obviously improper or incorrect as to call for a reversal.

No evidence was offered by the state on the hearing.

■ The trial court did not abuse its discretion in refusing the motion for a new trial.

The court charged the jury upon the law of murder with and without malice, aggravated assault, simple assault, and self-defense against real and apparent danger and the protection of his property, the pickup.

The evidence is sufficient to support the conviction and no error appearing, the judgment is affirmed.

Opinion approved by the Court.